## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | ) | **CHAPTER 11** |
| | ) | |
| **PHILLIPS INVESTMENTS, LLC,** | ) | **Case No. 14-61444** |
| | ) | |
| | ) | **JUDGE DIEHL** |
| Debtor. | ) | |

## DEBTOR'S MOTION (A) FOR AUTHORITY TO SELL CERTAIN REAL PROPERTY AND RELATED ASSETS OF THE DEBTOR FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES, (B) TO APPROVE THE ASSUMPTION AND ASSIGNMENT OF CERTAIN LEASES IN CONNECTION THEREWITH, AND (C) CERTAIN RELATED RELIEF

> **PARTIES TO LEASES WITH DEBTOR SHOULD EXAMINE EXHIBITS "B" AND "C" ATTACHED HERETO TO LOCATE THEIR NAMES AND LEASES**

COMES NOW, Phillips Investments, LLC, debtor and debtor-in-possession herein ("**Debtor**"), by and through its undersigned counsel, and hereby files this motion (the "**Motion**") with the Court seeking an order (a) approving and authorizing the sale of certain improved commercial real property and related assets of the Debtor free and clear of liens, claims and interests (the "**Sale**"), (b) authorizing the assumption and assignment of certain unexpired tenant leases, and (c) granting related relief (the "**Sale Order**"), pursuant to Sections 105(a), 363, and 365 of the Bankruptcy Code and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"). In support of this Sale Motion, the Debtor respectfully represents:

## BACKGROUND

1.      The Debtor is a Georgia limited liability company which owns various parcels of real property located in Gwinnett County, Georgia and operates two shopping centers on its property commonly known as **Gwinnett Station** and **Gwinnett Prado**.

2.      Gwinnett Station is located at or about 2180 Pleasant Hill Road, Duluth, Georgia 30396 and consists of approximately 9.7 acres of improved real property together with a building located thereon of approximately 103,090 square feet and certain related personal property and other assets.  The Debtor is the lessor on a number of leases (the "**Gwinnett Station Leases**") with various tenants for space located in Gwinnett Station.  The Gwinnett Station Leases are listed on the attached Exhibit B.

3.      Gwinnett Prado is located at or about 2300 Pleasant Hill Road, Duluth, Georgia 30396 and consists of approximately 32 acres of improved real property together with buildings located thereon totalling approximately 361,715 square feet and certain related personal property and other assets. The Debtor is the lessor on a number of leases (the "**Gwinnett Prado Leases**") with various tenants for space located in Gwinnett Prado. The Gwinnett Prado Leases are listed on the attached Exhibit C.  The Gwinnett Station Leases and the Gwinnett Prado Leases are collectively referred to below as the "**Leases**").

4.      On June 11, 2014 (the "**Petition Date**"), in order to protect itself from creditors, continue operating as a going concern, and facilitate the sale of some or all of its assets, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  Since the Petition Date, the Debtor has continued in possession of its property and is operating its

business as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

5.      No official committee of unsecured creditors, trustee or examiner has been appointed in this bankruptcy case.

6.      Prior to the Petition Date, East West Bank had made certain loans to the Debtor. In connection therewith, East West Bank asserts first priority security interests in substantially all of the assets of the Debtor, including Gwinnett Station and Gwinnett Prado.  As of the Petition Date, East West Bank asserted that the aggregate amount owed to it by the Debtor totaled approximately $17.6 million.  Following the Petition Date, the Court has entered a series of orders authorizing the Debtor to utilize East West Bank's cash collateral on an interim basis.  The current such cash collateral order expires on November 2, 2014.

## Jurisdiction And Venue

7.      This Court has jurisdiction of this Sale Motion pursuant to 28 U.S.C. Sections 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. Sections 157(b)(2)(A), (N) and (O).  Venue of the Debtor's Chapter 11 case and this Motion in this District is proper pursuant to 28 U.S.C. Sections 1408 and 1409.  The statutory predicates for the relief sought herein are Sections 105(a), 363 and 365 of the Bankruptcy Code and Rules 2002, 6004, 9006 and 9007 of the Federal Rules of Bankruptcy Procedure.

## The Shang Hei Purchase Agreement

8.      Both prior to and after the Petition Date, the Debtor has been in discussions with a number of entities with respect to a potential sale of Gwinnett Station, Gwinnett Prado, or both.  As a result of these negotiations, on or about October 14, 2014, the Debtor entered into a real estate purchase agreement (together with any and all exhibits, schedules, appendices and

3

attachments thereto, the "**Shang Hei Purchase Agreement**") with Shang Hei, LLC ("**Shang Hei**") pursuant to which the Debtor would sell and Shang Hei would acquire all of the Debtor's rights, title and interest to and in Gwinnett Station and the Gwinnett Station Leases, and certain related assets, for the aggregate purchase price of **$7.5 million**.    A copy of the Shang Hei Purchase Agreement is attached hereto as Exhibit A.    The material terms of the Shang Hei Purchase Agreement are summarized below:

    a.  **Property to be Purchased.**  Gwinnett Station and certain related assets.

    b.  **Gross Purchase Price**. $7.5 million.

    c.  **Real Estate Commission**. $25,000 will be paid by the Debtor from the sale proceeds to Shang Hei's real estate broker, Regent Group Realty LLC. Any additional amount that might be owed to Regent Group Realty LLC in connection with the sale will be the sole responsibility of Shang Hei.

    d.  **Prorations, Deposits, Etc.**  Collected rents, fees, taxes, deposits and other amounts shall either be prorated as of the closing date or treated as otherwise specified in the Shang Hei Purchase Agreement.

    e.  **Earnest Money Deposit**.   $200,000, deposited with the Debtor's bankruptcy counsel to be held in the counsel's escrow account.

    f.  **Inspection Period.**  Thirty days from the date of execution of the Shang Hei Purchase Agreement.  It is expected that the inspection period will have expired prior to the Auction and the Sale Hearing.

    g.  **Closing Date.**  Closing is to occur on a date on or before fifteen days after the Court enters the Sale Order.  Shang Hei may extend the closing date for

an additional 45 days upon payment of a non-refundable $300,000 payment to the Debtor.

h. **Leases**. The Debtor will assume the Gwinnett Station Leases and assign them to Shang Hei at closing.

i. **Free and Clear**. Other than the Debtor's obligations as landlord under the assigned Gwinnett Station Leases, Gwinnett Station will be conveyed to Shang Hei free and clear except for recorded easements, rights-of-way and deed restrictions as specified in attachments to the Shang Hei Purchase Agreement.

j. **Expense Reimbursement.** If the Bankruptcy Court does not approve the Shang Hei Purchase Agreement for any reason, including if another entity is the Prevailing Bidder at the Auction, the Debtor's counsel shall promptly return the deposit to Shang Hei and the Debtor (or the Debtor's principal member) shall pay Shang Hei an additional amount of up to $15,000 to compensate Shang Hei for its out of pocket expenses in connection with its inspection of Gwinnett Station.

9.    Contemporaneously with this Motion, the Debtor has filed a motion with the Court seeking approval of proposed sale procedures (the "**Sale Procedures**"), which include (a) proposed procedures and deadlines by which other entities could submit competing bids for Gwinnett Station and/or Gwinnett Prado (or any portion thereof), (b) scheduling an auction (the "**Auction**") if one or more Qualified Bids (as defined in the Sale Procedures) are timely received, (c) a form of notice with respect to the proposed Sale, the Sale Procedures, the Auction, and the proposed assumption and assignment of the Leases, (d) scheduling a hearing

5

date to approve the proposed sale of Gwinnett Station, Gwinnett Prado, and/or any other assets of the Debtor (the "**Sale Hearing**") and the form of notice to be provided to parties in interest with respect thereto.

## SUMMARY OF RELIEF REQUESTED

10.   By this Motion the Debtor seeks the entry of the Sale Order, which would, among other things, (i) approve the terms and conditions of the Shang Hei Purchase Agreement (and/or any other asset purchase agreements that might be entered into as a result of the Auction) between the Debtor, as seller, and Shang Hei or the Prevailing Bidder (as defined in the Sale Procedures), as buyer (the "**Buyer**"), providing for the sale of the Gwinnett Station and/or Gwinnett Prado (or any portion thereof) to the Buyer free and clear of all claims and interests (other than those specified in the Shang Hei Purchase Agreement and/or other purchase agreements approved by the Court), with any security interests and/or liens attaching to the net proceeds of the Sale following the payment of any real or personal property taxes due with respect to Gwinnett Station and Gwinnett Prado; (ii) approve the assumption and assignment by the Debtor to the Buyer(s) of the  Leases subject to the Shang Hei Purchase Agreement and/or other purchase agreement approved by the Court; and (iii) authorizing and directing the Debtor to consummate the Sale and the transactions contemplated therein, as such transactions are more fully described in this Sale Motion and the Shang Hei Purchase Agreement and/or other purchase agreement approved by the Court.

## RELIEF REQUESTED

### The Court Should Approve the  the Sale of the Property to the Buyer Free and Clear of All Interests

11.   The Court should approve the sale of Gwinnett Station and/or Gwinnett Prado to the Buyer(s) pursuant to section 363(b)(1) of the Bankruptcy Code, which authorizes a

debtor-in-possession to sell property of the estate other than in the ordinary course of business after notice and hearing.  11 U.S.C. § 363(b)(1).  Courts in this and other jurisdictions routinely approve the sale of substantially all or a significant portion of a debtor's assets under section 363 of the Bankruptcy Code based upon the sound business judgment of the debtor.  *See, e.g., In re Chateaugay Corp.*, 973 F.2d 141 (2nd Cir. 1992); *Stephens Indus. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *In re WFDR, Inc.*, 10 B.R. 109 (Bankr. N.D. Ga. 1981).

12.     In the instant case, the Debtor believes that the proposed sale is within its sound business judgment.  As noted above, East West Bank asserts a first priority security interest in all of the assets of the Debtor, including Gwinnett Station and Gwinnett Prado, to secure obligations that as of the Petition Date appeared to total approximately $17.6 million.  The current order authorizing the Debtor to continue using East West Bank's cash collateral expires on November 2, 2014.  The Debtor believes that if and when it closes on the Sale of  Gwinnett Station and Gwinnett Prado, it will be able to pay off its debt to East West Bank in full.  But even if it only sells Gwinnett Station, it will still be in a position to pay several million dollars from the sale proceeds to East West Bank and will  retain a multi-million dollar equity cushion in Gwinnett Prado that can be used as a basis for a plan of reorganization.

13.     Gwinnett Station and/or Gwinnett Prado are to be sold free and clear of all liens and other interests (other than any recorded encumbrances).  In order to satisfy any tax liens that might exist or otherwise arise on those properties, however, the Debtor requests authority to pay from the sale proceeds any real or personal property tax obligations that might be due with respect to Gwinnett Station and Gwinnett Prado.  Any remaining valid security interests will attach to any remaining net sale proceeds in the same priority and to the same extent as existed in the property prior to the sale.

14.     Pursuant to section 363(f) of the Bankruptcy Code, a debtor may sell property free and clear of any interest in such property if, among other things, the entity asserting an interest in the property consents to the sale, the sale price for the property is greater than the aggregate value of all liens on the property, or such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of its interest.  11 U.S.C. § 363(f)(2), (3) & (5).  The Debtor believes that East West Bank will consent to the proposed sale.  Even if East West Bank does not consent, however, the Debtor anticipates that the aggregate sale price for Gwinnett Station and Gwinnett Prado will greatly exceed the value of any liens on those properties.

15.     The proposed Sale to Shang Hei and any other Buyer is the result of a completely arms-length transaction between two unrelated parties.  There are no affiliations between Shang Hei, the Debtor or their principals.  Both the Debtor and Shang Hei were represented by experienced counsel in negotiating and drafting the Shang Hei Purchase Agreement.  The Debtor believes that the proposed purchase price represents a fair value for Gwinnett Station and is the highest price that is reasonably achievable for that property. Moreover, the Sale Procedure and the Auction will ensure that Gwinnett Station and/or Gwinnett Prado will be sold at the highest and best price readily achievable.  Accordingly, the Debtor requests the Court to find the Buyer – whether Shang Hei or another Prevailing Bidder – to be a good faith purchaser subject to the protections afforded such a purchaser under section 363(m) of the Bankruptcy Code.

## The Court Should Approve the Assumption and Assignment of the Leases to the Buyer

16.     If the Shang Hei Purchase Agreement is approved, the Debtor intends to assume the Gwinnett Station Leases and assign them to Shang Hei in connection with the Sale.  It is

possible, however, that one or more Buyers may request different or additional Leases to be assigned to them, including the Gwinnett Prado Leases.  Any such Leases to be assumed and assigned to a Buyer would be designated in any purchase agreement approved by the Court.

17.    Prior to the hearing on this Motion, the will have provided all non-Debtor parties to the Leases with notice of the proposed Sale, the Sale Procedures, the Auction and the proposed assumption of the Leases and their proposed assignment to the Shang Hei or other Buyer.    Such non-Debtor parties to those Leases will have the opportunity to object to the proposed assignments or any proposed cure amounts due under the Leases at or prior to the hearing to approve this Motion.

18.    The Debtor submits that all of the Leases are fully assignable a Buyer pursuant to section 365 of the Bankruptcy Code and applicable law.  The Debtor does not believe there are any defaults under any of the Leases.  Accordingly, the Debtor does not propose paying any cure amounts to any tenants under those Leases.  To the extent necessary, the Debtor is confident that all  Buyers will be able to provide adequate assurance of their future performance under the  Leases within the meaning of section 365(f)(2)(B) of the Bankruptcy Code.

19.    For the foregoing reasons, the Debtor requests that the proposed assumption of the designated Leases and their assignment to Shang Hei and/or other Buyer(s) be approved.

### **Request of Waiver of Stay**

20.    In accordance with Bankruptcy Rules 6004(h) and 6006(d), the Debtor requests that the Court waive any stay of the entry of an order approving this Motion and authorize the Debtor to consummate the Sale with the Buyer(s), including the assumption and assignment of the Leases, at any time after the entry of such order.

## Notices

21.     In accordance with the Sale Procedures, the Debtor will provide proper, timely, adequate, and sufficient notice of (a) this Sale Motion, (b) the proposed Sale of Gwinnett Station and/or Gwinnett Prado, (c) the Auction; (d) the Sale Hearing, and (e) the proposed assumption and assignment of the Leases to all interested persons and entities, including (i) the United States Trustee for the Northern District of Georgia; (ii) all known creditors of the Debtor, including taxing authorities, or their known counsel; (iii) those parties who have requested service of  motions and pleadings pursuant to Bankruptcy Rule 2002; and (iv) the non-Debtor parties to the Leases.

22.     The Debtor submits that no other or further notice of the relief sought with respect thereto shall be required.

WHEREFORE, the Debtor respectfully requests that the Court enter an order (i) approving the Shang Hei Purchase Agreement (and/or any subsequent asset purchase agreement for Gwinnett Station and/or Gwinnett Prado entered into by the Debtor and any Buyer(s) pursuant to the Auction), (ii) authorize and approve the sale of Gwinnett Station and/or Gwinnett Prado free and clear of all claims, liens and interests (other than recorded easements) to the Buyer(s) on the terms and conditions set forth in the applicable purchase agreements, (iii) approve the Debtor's assumption of the  designated Lease and the assignment of same to the Buyer(s) pursuant to section 365 of the Bankruptcy Code, (iv) authorize and direct the Debtor to utilize the sale proceeds to satisfy any unpaid real estate or personal property taxes owed on the Debtor's assets, and (v) grant such other and further relief as may be just and proper.

This 24th day of October, 2014.

Respectfully submitted,

SCROGGINS & WILLIAMSON, P.C.

1500 Candler Building   /s/ J. Hayden Kepner, Jr.
127 Peachtree Street, NE  J. ROBERT WILLIAMSON
Atlanta, GA 30303    Georgia Bar No. 765214
T: (404) 893-3880    J. HAYDEN KEPNER, JR.
F: (404) 893-3886    Georgia Bar No. 416616
E: rwilliamson@swlawfirm.com
  hkepner@swlawfirm.com  *Counsel for Debtor*

11

**EXHIBIT "A"**

### REAL ESTATE PURCHASE AGREEMENT

### BETWEEN

### PHILLIPS INVESTMENTS, LLC

as Seller

and

### SHANG HEI, LLC

as Purchaser

OCT, 14, 14

21195461.2

## REAL ESTATE PURCHASE AGREEMENT

THIS REAL ESTATE PURCHASE AGREEMENT (this "Agreement") is made this _____ day of September, 2014, by and among PHILLIPS INVESTMENTS, LLC, a Georgia limited liability company (herein referred to as "Seller"), and SHANG HEI, LLC, a Georgia limited liability company (herein referred to as "Purchaser"). Seller is a debtor and debtor in possession under Title 11 of the United States Code ("Bankruptcy Code") in a case pending under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division ("Bankruptcy Court"), captioned *In re Phillips Investments, LLC*, Case No. 14-61444-mgd..

### STIPULATION

Subject to the terms and conditions of this Agreement, Seller desires to convey, and Purchaser desires to acquire, all of Seller's right, title and interest in and to the Property (as hereinafter defined) pursuant to the terms of this Agreement.

FOR AND IN CONSIDERATION of Ten and No/100 Dollars and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Purchaser and Seller hereby covenant and agree as follows:

1. **PROPERTY TO BE CONVEYED**. Seller shall sell to Purchaser and Purchaser shall purchase from Seller all of Seller's right, title and interest in and to the following on the terms and conditions contained in this Agreement:

1.01   Land. Purchaser agrees to buy, and Seller agrees to sell all that tract of land, with such improvements as are located thereon, described as follows:  the property consisting of approximately 9.7441 acres which includes on it a building consisting of approximately 100,000 square feet located in Gwinnett Station Shopping Center, tax parcels R6232 037 and R6232 035, 2180 Pleasant Hill Road, Duluth, Georgia; more particularly described in Exhibit "A" attached hereto  (the "Land").

1.02   Improvements. All the buildings and improvements located on the Land (the "Improvements").

1.03   Personalty.  All appliances, furniture, fixtures, machinery, equipment, supplies and other personal property, if any, owned by Seller and attached to or located at the Land (the "Personalty").

1.04   Leases. All of Seller's right, title and interest as landlord under the tenant leases on the Property (the "Leases").   All security deposits or damage deposits paid in connection with the Leases which have not been refunded to or forfeited by the tenants ("Tenants") under the Leases (the "Security Deposits") as of the Closing Date. Purchaser shall receive the Security Deposits as a credit against the Purchase Price payable at the Closing. Seller shall obtain and deliver to Purchaser, not later than five (5) days prior to the Closing, tenant estoppel certificates from each of the tenants or other occupants of the Land on a form reasonably acceptable to Purchaser. If Seller, after reasonable efforts is unable to obtain a tenant

*Oct, 14.14*

21195461.2

estoppel certificate from one or more Tenants, then Seller may provide a certificate concerning those leases.

1.05    Intangibles/Exception.    All of Seller's right, title and interest in any assignable licenses, contracts and warranties related to the operation of the Land or the Improvements. Purchaser acknowledges that the right to use the "Gwinnett Prado" or "Gwinnett Station" name will not be assigned. The Seller has no right to assign the "Gwinnett Prado" or "Gwinnett Station" names and accordingly, the Purchaser will have no right to use the "Gwinnett Prado" or "Gwinnett Station" names relative to the Property.

All of the real and personal property described in items 1.01 through 1.05 hereof is collectively referred to herein as the "Property". Seller's conveyance of the Land and the Improvements to Purchaser shall be subject to (i) the matters set forth on Exhibit C attached hereto (the "Existing Exceptions"), (ii) any matters approved or deemed approved by Purchaser under Section 3 hereof or otherwise included therein (together with the Existing Exceptions, the "Permitted Exceptions") and (iii) the Deed Restrictions (see Exhibit B).

2.    **PURCHASE PRICE AND DEPOSITS**.

2.01    Purchase Price.    Purchaser shall pay to Seller the purchase price of SEVEN MILLION FIVE HUNDRED THOUSAND AND NO/100THS DOLLARS ($7,500,000.00) (the "Purchase Price"). At the Closing, the Purchaser shall pay the Purchase Price to Seller. The payment of the Purchase Price at the Closing will be paid by wire transfer to an account or accounts designated by Seller or by cashier's check, at Seller's option.

2.02    Deposit.    Within three (3) business days after the date of this Agreement, Purchaser shall pay TWO HUNDRED THOUSAND DOLLARS ($200,000.00) to bankruptcy counsel for Seller (together with interest or other income earned thereon, collectively referred to as the "Deposit") to be held in counsel's attorney escrow account. At the Closing, bankruptcy counsel for Seller shall pay the Deposit to Seller by wire transfer in accordance with the provisions of 2.01 and the Deposit shall be applied and credited in reduction of the Purchase Price. The Deposit shall be refunded to Purchaser in full, together with all accrued interest, if (i) the Bankruptcy Court for the Northern District of Georgia ("Bankruptcy Court") does not approve this Agreement; (ii) Seller defaults; (iii) the conditions to Purchaser's obligation to close are not satisfied or waived by Purchaser; (iv) or as otherwise set forth herein. All interest earned on the Deposit shall accrue to the benefit of Purchaser. Disbursement of the Deposit shall only be made by order of the Bankruptcy Court.

3.    **SURVEY, TITLE**.

3.01    Survey.    The Purchaser may, at its sole cost and expense, cause a surveyor of Purchaser's choice to make a survey (the "survey") of the Land.

3.02    Exceptions to Title.    Seller shall convey fee simple title to the Land and Improvements to Purchaser by good and sufficient Georgia limited warranty deed (the "Deed") which shall be made expressly subject only to the Existing Exceptions listed on Exhibit C, ad valorem property taxes for the current and subsequent years, the deed restrictions set forth on Exhibit B (the "Deed Restrictions") and applicable building, zoning and environmental laws and

*Oct, 14·14*

2

ordinances.  The Property shall not be subject to any mortgage, deed of trust, security agreement, judgment, lien or claim of lien or any other title exception or defect created or caused by Seller or by the direct actions of Seller that is monetary in nature, Seller hereby agreeing to pay and satisfy of record any such monetary title defects or exceptions prior to or at Closing at Seller's expense.  To enable Seller to make conveyance as herein provided, Seller may, at the time of delivery of the Deed, use the Purchase Money or any portion thereof to clear the title of any or all encumbrances or interest, provided that all instruments so procured are recorded simultaneously with the delivery of the Deed or provided that arrangements reasonably satisfactory to Purchaser and purchaser's title insurance company are made for subsequent recording.  Purchaser may obtain, at Purchaser's expense, an owner's title insurance commitment in favor of Purchaser (the "Commitment") setting forth exceptions to the insurability of the title to the Property.  Not later than fifteen (15) business days prior to Closing, Purchaser shall deliver to the Seller a statement in writing of any objections to matters shown in the Commitment and the Survey and the Seller shall have the right (but not the obligation) within a reasonable time thereafter in which to cure any such objections.  Any objections to the Existing Exceptions or the Deed Restrictions must be made in writing on or before the end of the Inspection Period or are forever waived.  In the event that the Seller fails to cure any such objections, Purchaser may (i) terminate this Agreement, whereupon Escrow Agent shall return the Deposit to Purchaser and neither party hereto shall have any further rights or obligations hereunder except those which expressly survive the termination hereof or (ii) remove any such objections (but only as to deeds to secure debt, mortgages, mechanic's or materialmen's liens, judgments expressly assumed, created or suffered by Seller against the Property, hereinafter collectively referred to as "Monetary Liens") and pay the Monetary Liens at Closing from the Purchase Price in accordance with the amount of money due and payable for such Monetary Lien, or (iii) waive such objections and close the transaction contemplated by this Agreement in accordance with all of the terms and provisions hereof.  At any time prior to the Closing Date, the Purchaser shall have the right to check down the title from and after the effective date of the Commitment and deliver to the Seller a written statement of any objection which affects title to the Property occurring subsequent to the preliminary title examination.  The Seller shall have the right (but not the obligation) until the Closing Date to cure, at its expense, any such objection.  In the event the Seller fails or refuses to cure such objection prior to the Closing Date, the Purchaser shall have the same rights with respect to such failure or refusal set forth in this Section as to preliminary title objections.

4.    **SELLER'S DOCUMENTS**.

4.01    Contracts.  Seller, at Seller's sole cost and expense, will cancel the service contracts which affect the Property within forty-eight hours of Closing.  Purchaser shall, at Purchaser's cost, obtain service contracts required for the Property.  Seller to receive refund from all utility deposits made by Seller.

5.    **SELLER'S REPRESENTATIONS AND QUALIFICATIONS**.

5.01    Representations.  Seller represents to Purchaser as follows:

(a)    Corporate Existence and Authority.  Seller (i) is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of

*Oct, 14, 14*

3

Georgia; and (ii) has the authority to enter into this Agreement and to consummate the transactions provided for herein. Seller is authorized to do business in Georgia and was authorized to do business in Georgia at the time it acquired the Property.

(b)    Environmental Matters. Seller has no actual knowledge of the existence of any pollutants, contaminants, toxic, or other hazardous substances including, but not limited to PCB's and asbestos of any kind, on or beneath the surface of the Property which are in violation of any Federal, State or local laws or regulations.

(c)    Legal Compliance. Seller has received no written notice regarding any violations of the Property of any municipal or county ordinance or other legal requirement with respect to the Property or with respect to the use, occupancy or construction thereof.

(d)    Leases. There are no brokerage commissions or leasing commissions payable under the Leases.

(e)    Other Agreements. The Property is not the subject of any outstanding agreements with any party pursuant to which any such party may acquire any interest in the Property, other than the right of occupancy as set forth in any Lease of a portion of the Property.

5.02    Accuracy at Closing. All of the representations of Seller contained in this Agreement are true and correct as of the date of this Agreement and shall be true and correct as of the Closing Date.

5.03    Limitations on Representations. Purchaser acknowledges and agrees that Purchaser is experienced in the ownership and operation of properties similar to the Property and that Purchaser is qualified to inspect and evaluate the Property. Purchaser hereby acknowledges that Seller is not making and shall not be obligated to make any representation or warranty whatsoever except as expressly set forth in this Agreement. Seller's representations and warranties with regard to title matters affecting the Property, if any, shall be subject to the Permitted Exceptions, and shall be limited to a warranty against the claims of all persons claiming by, through or under Seller, but not against any others. Purchaser specifically acknowledges that it is purchasing the Property "AS IS, WHERE IS, WITH ALL FAULTS" and that Seller is not making any representation or warranty with respect to the Property, either express or implied, except as otherwise may be expressly provided in this Agreement, and that except as otherwise expressly provided in this Agreement Seller shall have no responsibility whatsoever for any defect in the physical condition of any of the Property or for any violation of any law, ordinance or regulation regarding the condition, use or operation of all or any part of the Property. Except as expressly set forth herein, Seller hereby specifically disclaims any representation or warranty, express or implied, including, without limitation, those concerning (a) the nature and condition of the Property and the suitability of the Property for any and all activities and uses which Purchaser may elect to conduct thereon, (b) the manner, construction, condition and state of repair or lack of repair of any improvements located on, or comprising, the Property or part thereof, and (c) the compliance of the Property or its operation with any laws, rules, ordinances or regulations of any government or other body, including, but not limited to, the Americans with Disabilities Act and other laws regarding access for handicapped persons, it being understood that Purchaser shall have had full opportunity prior to the Date of this

Oct, 14.14

4

Agreement to determine for itself the condition of the Property. Purchaser expressly acknowledges that, in consideration of the agreements of Seller in this Agreement, except as otherwise expressly set forth in this Agreement, SELLER HAS NOT MADE, AND DOES NOT MAKE, ANY WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF QUANTITY, QUALITY, CONDITION, HABITABILITY, MERCHANTABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY, ANY IMPROVEMENTS, ANY PERSONAL PROPERTY, SOIL CONDITIONS OR THE PRESENCE OR RELEASE OF HAZARDOUS MATERIALS. Without limiting the above, and except as expressly provided in this Agreement, Purchaser waives its right to recover from Seller and forever releases and discharges Seller from any and all damages, claims, losses, liabilities, penalties, fines, liens, judgments, costs, or expenses whatsoever (including, without limitation, attorneys' fees and costs), whether direct or indirect, first party or third party in nature, known or unknown, foreseen or unforeseen, that may arise on account of or in any way be connected with the physical condition of the Property or any law, regulation or ordinance applicable thereto, whether federal, state or local, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. Sections 9601 et seq.), the Resource Conservation and Recovery Act of 1976 (42 U.S.C. Section 6901 et seq.), the Clean Water Act (33 U.S.C. Section 466 et seq.), the Safe Drinking Water Act (14 U.S.C. Sections 1401-1450), the Hazardous Materials Transportation Act (49 U.S.C. Section 1801 et seq.), the Toxic Substances Control Act (15 U.S.C. Sections 2601-2629), and the Federal Water Pollution Control Act, as amended (33 U.S.C. §1251 et seq.), the Georgia Hazardous Site Response Act (O.C.G.A. § 12-8-90 et seq.), the Georgia Hazardous Waste Management Act (O.C.G.A. § 12-8-60 et seq.), the Georgia Comprehensive Solid Waste Management Act (O.C.G.A. § 12¬8-20 et seq.), the Georgia Water Quality Control Act (O.C.G.A. § 12-5-20 et seq.), and the Erosion and Sedimentation Act of 1975 (O.C.G.A. § 12-7-1 et seq). This paragraph 5.03 shall survive Closing.

6.    **TIME AND PLACE OF CLOSING**.

The closing (the "Closing") for the transfer of the Property shall be conducted at a location to be chosen by Purchaser in the Atlanta area on or before FIFTEEN (15) days after the approval of the agreement by the Bankruptcy Court (the "Closing Date").

Purchaser may extend the Closing Date by an additional Forty-Five (45) days upon payment of Three Hundred Thousand Dollars ($300,000), which shall be fully earned upon payment. Such payment must be made prior to Ten (10) days before Closing Date, otherwise the right to so extend the Closing Date as waived.

Neither Seller nor its counsel shall be required to attend the Closing in person; rather, Purchaser shall submit the required closing documents to counsel for Seller not less than five (5) days prior to the scheduled Closing Date for review, approval and execution by Seller. It is contemplated that the executed closing documents shall be delivered by Seller in trust to counsel for Purchaser by courier, with Purchaser wire transferring the proceeds due to Seller upon release of the closing documents. *Oct, 14, 14*

If Purchaser fails to designate a location and time for the Closing in Georgia, then the Closing will be conducted at the offices of Burroughs Keene Paulk & Von Schuch, LLC at 2900 Paces Ferry Road, Suite C-2000, Atlanta, Georgia 30339 at 10:00 a.m. on the Closing Date.

Seller will deliver possession of the Property (subject the rights of Tenants) to Purchaser at the Closing.

7.    **ITEMS TO BE DELIVERED BY SELLER AT CLOSING**.  At the Closing, Seller agrees to deliver the items listed below to Purchaser.

7.01    Limited Warranty Deed.    A Limited Warranty Deed conveying to Purchaser fee simple title to the Property, subject to the Permitted Exceptions and the Deed Restrictions.

7.02    Bill of Sale.  A duly executed Bill of Sale, conveying to Purchaser all of Seller's right, title and interest in and to the Property which is or may be considered to be personal property associated with the Land.  The Bill of Sale shall not contain any warranties with respect to the condition of such personal property or the title thereto except that Seller shall warrant Seller's right, title and interest in the personal property against the claims of all persons claiming by, through or under Seller.

7.03    Assignment of Leases.    A duly executed Assignment of Leases ("Assignment of Leases") assigning to Purchaser all of Seller's right, title and interest in and to the Leases and Security Deposits in effect with respect to the Property.  Purchaser shall assume all of the landlords' obligations under the Leases arising from or after the Closing Date. Purchaser shall agree to indemnify and hold Seller harmless with respect to all obligations of landlord under the Leases arising from and after the Closing Date.  Seller shall agree to indemnify and hold Purchaser harmless with respect to all obligations of landlord under the Leases arising prior to the Closing Date.  Seller shall warrant at the Closing that all such security deposits have been properly dealt with in accordance with applicable law and the terms of the Leases under which such deposits were made, and shall indemnify Purchaser against any loss, claim or action arising from Seller's failure to properly deal with such deposits prior to Closing or to assign them in full to Purchaser as required herein, and Purchaser shall assume all obligations of Seller with respect to such deposits on the Closing Date and shall indemnify Seller against any loss, claim or action arising from Purchaser's failure to properly deal with such deposits after Closing.

7.04    1445 Certification.  A duly executed certificate stating that Seller is not a "foreign person" for U.S. income tax purposes.

7.05    Affidavit of Title.  An affidavit of title or other affidavit reasonably acceptable to Seller and customarily required of sellers by the title company insuring Purchaser's title (or another title company reasonably acceptable to Purchaser) to remove the standard exceptions from an owner's title insurance policy for rights of parties in possession and mechanics' liens that has as its subject matter inter alia, averments that, to the actual knowledge of the person signing the affidavit for Seller, (i) there are no rights or claims of parties in possession not shown by the public records except for the Leases, (ii) there are no liens or

*Oct, 14,14*

6

encumbrances other than those as to which specific provision is made at Closing, (iii) there are no liens, or rights to a lien, for services incurred by Seller (including, but not limited to, real estate brokerage services incurred by Seller), labor or material furnished at the request of Seller and not shown by the public records, (iv) the Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986, as amended, and the Regulations thereunder, and (v) the Seller is not a "non-resident" within the meaning of O.C.G.A. § 48-7-128.

Nothing contained in the affidavit of Seller shall in any way be deemed to modify or enlarge the other representations contained in this Agreement or the limited warranty deed from Seller to Purchaser, and the affidavit shall so state.

7.06    Authority Documents.  Evidence that Seller and those acting for and on behalf of Seller have full authority to consummate this transaction in accordance with the terms of this Agreement as modified through the Closing.

7.07    Closing Statements.  A customary closing statement.

7.08    Seller's Affidavit Regarding Real Estate Brokers.  An affidavit with respect to brokers liens and services customarily required of sellers by the title company (or another title company reasonably acceptable to Purchaser) acting as title insurer.

7.09    Rent Roll.  On the Closing Date, Seller will provide Purchaser with an accurate schedule of all security deposits being assigned hereunder, and a  rent roll updated to the day before the Closing Date.

7.10    Leases.  All original counterparts of the Leases and any amendments and modifications thereof.

8.    **ITEMS TO BE DELIVERED BY PURCHASER AT CLOSING**.  At the Closing, Purchaser agrees to deliver the items listed below to Seller.  Drafts of all documents to be delivered by Purchaser shall be delivered to Seller and its counsel for review not later than five (5) business days prior to the Closing.

8.01    Purchase Price.  Purchaser deliver the Purchase Price to Seller.

8.02    Assignment of Leases.  The Assignment of Leases.

8.03    Authority Documents.  Evidence that those acting for Purchaser have full authority to consummate this transaction in accordance with the terms of this Agreement as modified through Closing.

8.04    Closing Statement.  The Closing Statement.

8.05    Purchaser's Affidavit Regarding Real Estate Brokers.  An affidavit with respect to brokers' liens and services customarily required of purchasers by the title company (or another title company reasonably acceptable to Purchaser) acting as title insurer.  Oct, 14, 14

7

8.06    <u>Other Documentation</u>. Such other documentation as may reasonably be necessary to carry out the transactions contemplated hereby, including without limitation any documentation that may be necessary for Seller to comply with any reporting requirements that may be imposed on Seller by applicable law.

9.    **<u>PRORATIONS AND CLOSING PAYMENTS</u>.**

9.01    <u>Items Prorated</u>. The following items shall be apportioned as of midnight on the day prior to the Closing Date (the "Adjustment Date"): (i) collected rents; and (ii) collected charges and fees, if any, for common area maintenance; (iii) real estate taxes and assessments, to the extent not payable by Tenants directly to the applicable taxing authority under the Leases. At the Closing, the Purchase Price shall be adjusted to reflect net adjustment. To the extent the exact amount of any items to be prorated at Closing are not known, the parties will use their best efforts to estimate such items and agree to make any necessary adjustments to such prorations when the exact amounts are known.

9.02    <u>Rent Proration</u>. The proration of collected rents shall be effected so that Seller shall be credited with and entitled to all such rent paid for the period through midnight of the day prior to the Closing Date, and Purchaser shall be credited with and entitled to all such rent paid for the period including and after the Closing Date. Purchaser shall receive a credit against the Purchase Price payable at Closing equal to the amount of any prepaid rents paid to Seller as of the Closing Date.

9.03    <u>Delinquent Rents</u>. Seller shall deliver to Purchaser on the Closing Date a schedule identifying any delinquent rents under the Leases or rents under the Leases that have accrued but are unpaid as of the Closing Date. No proration shall be made for rents delinquent or due but unpaid as of the Closing Date. Seller shall have no obligation to commence any action to enforce the obligation of the Tenants to pay the delinquent rents during the period of this Agreement. However, all amounts collected by Purchaser from any Tenant for rents or fees due prior to the Closing shall be promptly paid to Seller by Purchaser.

9.04    <u>Utility Charges and Operating Expenses</u>. Utility charges (to the extent not payable by the Tenants directly to the utility provider under the Leases) for telephone, electricity, sewer, water and other utilities, if any, shall not be prorated as of the Closing Date to the extent that arrangements can be made by Seller for the rendition of final bills, based upon a reading of meters within forty-eight (48) hours of the Closing Date. Seller shall be responsible for and shall pay all such bills for utility services (to the extent not payable by the Tenants under the Leases) up to the Closing Date. Purchaser shall assume responsibility for the payment of utility services provided to the Property from and after the Closing Dates. Purchaser shall have the obligation, at Purchaser's expense, to have all utility services changed to Purchaser within forty-eight (48) hours of Closing. To the extent that utility bills cannot be handled in the foregoing manner, they shall be prorated as of the Closing Date based upon the most recent bills available and readjusted on the basis of the actual bills rendered for the period during which the Closing Date occurs, as and when such bills are received.

9.05    <u>Utility Deposits</u>. Seller shall be entitled to receive a return of all utility deposits placed with any utility company and Purchaser shall be responsible to place its own

*OА, 14/14*

deposits with any such utility companies. Seller shall terminate its utility accounts (if any) as of two (2) days after the Closing Date and Purchaser shall be responsible for establishing its own utility accounts if necessary.

9.06    Security Deposits.  At the Closing Seller shall pay to Purchaser in the form of a credit against the Purchase Price a sum equal to the aggregate of the Security Deposits paid under the Leases and not previously refunded to or forfeited by the Tenants.  Purchaser shall hold such deposits in trust for the benefit of the Tenants.

9.07    Insurance.  Seller shall maintain in full force and effect its existing insurance with respect to the Property (if any), which insurance may be canceled for the Property as of the date of the Closing.  Purchaser shall be responsible for obtaining its own insurance coverage after the Closing.

9.08    Taxes and Assessments.    Accrued general real estate, personal property and ad valorem taxes for the current year shall be prorated on the basis of bills, if available prior to Closing.  If such bills are not available, then such taxes shall be prorated on the basis of one hundred percent (100%) of the most recent ascertainable taxes for the Property and promptly re-prorated upon the issuance of final bills thereof, and any amounts due from one party to the other shall be paid in cash at that time.  Prior to or at Closing, Seller shall pay or have paid all bills which are due and payable prior to or as of Closing and shall furnish evidence of such payment to Purchaser and the Title Company.  Seller shall pay any unpaid taxes on the Property in respect to prior years and may retain the amount of any refunds of such taxes previously paid.

9.09    Other Costs.  Purchaser shall pay all costs of closing so as to allow Seller to receive the Purchase Price in full, except for credits previously set forth herein.  Purchaser shall pay (i) the cost of any title examination conducted by Purchaser, the cost of Purchaser's title commitment ("Purchaser's Title Commitment"), and the cost of any title insurance obtained by Purchaser, (ii) the cost of any survey of the Property conducted by the Purchaser and the cost of any additional certification or updates of any existing survey; (iii) all recording costs relating to the transaction contemplated hereby, (iv) all costs related to any studies or examinations of the Property by Purchaser, and (v) any applicable documentary tax/fee due in connection with recordation of any Security Deed, including but not limited to the Georgia intangibles tax, (vi) transfer tax, (vii) the costs of preparing and recording of the Deed (viii) the Purchaser's attorneys' fees and (ix) all other closing costs.  Seller will pay for its own attorney's fees only.

9.10    For purposes of calculating prorations, Purchaser shall be deemed to be entitled to the Property, and, therefore, entitled to the income therefrom and responsible for the expenses thereof for the entire day upon which Closing occurs.  All such prorations shall be made on the basis of the actual number of days of the year and month which shall have elapsed as of the Adjustment Date.  The amount of such prorations shall be adjusted in cash after Closing, as and when complete and accurate information becomes available, or upon notice by either party that any initial adjustments provided for in this Agreement is inaccurate.  Seller and Purchaser agree to cooperate and use their best efforts to make such adjustments no later than one (1) year after Closing.  All items of income and expense for the period prior to the Adjustment Date will be for the account of Seller and all items of income and expense for the

Oct, 14, 14

period on and after Closing will be for the account of Purchaser, all as determined by the accrual method of accounting. Bills received after Closing which relate to expenses incurred, services performed, and any and all amounts allocable to the period prior to the Adjustment Date, shall be paid by Seller.

9.11    BROKER COMMISSION.    Purchaser shall pay REGENT GROUP REALTY LLC a real estate commission stated in a separate agreement. In addition, Seller shall pay a real estate commission to REGENT GROUP REALTY LLC in the amount of Twenty-Five Thousand Dollars ($25,000) if this transaction closes. Seller shall have no obligation to pay any real estate commission unless the transaction closes, regardless of which party, if any, may be in default. REGENT GROUP REALTY LLC represents the Purchaser only. The parties shall indemnify and hold the other party harmless for any commission incurred. This broker commission shall be due if, and only if, the Closing takes place, the Property is transferred to Purchaser and the Seller receives all amounts due under the Agreement.

9.12    The terms and provisions of this Section 9 shall survive the Closing.

10.    **CONDEMNATION**.    If prior to the closing all of the Property shall be taken by condemnation or eminent domain, this Agreement shall be automatically canceled, the deposit shall be returned to purchaser, and thereupon neither party shall have any further liability or obligation to the other except as otherwise provided herein. If prior to the closing Seller received notice that (i) less than all of the Property shall be taken by condemnation or eminent domain, or (ii) there shall be any taking of land lying in the bed of any street, road, highway or avenue, open or proposed, in front of or adjoining all or any part of the Land, or (iii) there is any change of grade of any such street, road, highway or avenue, then Seller shall promptly notify purchaser of such event. Purchaser may, at its option, cancel this Agreement by giving Seller written notice thereof within five (5) days after receipt of Seller's notice (and if necessary the Closing shall automatically be extended to give purchaser the full benefit of this time period), in which event the deposit shall be returned to purchaser, and thereupon neither party shall have any further liability or obligation to the other with respect to the sale transaction contemplated hereby except as otherwise provided herein. If this Agreement is not canceled within the said five (5) day period, purchaser shall accept title to the Property subject to taking or change of grade described above, in which event at the closing the proceeds of the award or payment shall be assigned by Seller to purchaser and any moneys theretofore received by Seller in connection with such taking or change in grade shall be paid over to purchaser, less any amounts expended or committed by Seller for any repair or restoration. Purchaser hereby agrees that any conveyance from Seller pursuant to the terms of the agreement shall be subject in all respects to the satellite condemnation and purchaser hereby agrees to accept title to the Property subject to the satellite condemnation. Notwithstanding anything to the contrary contained herein, in no event (i) shall purchaser be entitled to any amount in connection with the satellite condemnation, or (ii) shall Seller be responsible to purchaser for any diminution in value of the Property resulting in any way from the satellite condemnation. As of the date of this Agreement, the satellite condemnation has not been completed. Seller hereby agrees to use commercially reasonable, good faith efforts to cause the satellite condemnation to be completed (i.e., to cause the conveyance of the condemnation property to Gwinnett County and the recording of the associated deeds in the appropriate public records). In the event the satellite condemnation is not completed on or before the date of closing, at closing Seller shall grant or cause others to grant to

*Oct, 14, 14*

purchaser easements in form and substance reasonably satisfactory to purchaser, providing, among other things access over the condemnation property for the benefit of purchaser and the Property (the "Condemnation Easements"). The terms of the Condemnation Easements shall provide that the easements automatically expire upon the completion of the satellite condemnation. In any event, in the event the satellite condemnation has not occurred on or before the date of closing, Seller shall use commercially reasonable, good faith efforts to cause the satellite condemnation to occur within a reasonable period of time following closing. The terms of this Section 10 shall expressly survive closing.

      **11.**    **CASUALTY LOSS**. If prior to the closing the property is damaged as the result of fire or other casualty, and either (i) such damage would cost in excess of $250,000 to repair, or (ii) such damage gives any tenant having a square footage of 45,000 square feet or more the right to terminate its lease and such tenant exercises such right, then Seller shall immediately notify purchaser of such event. Purchaser shall have the option to (a) accept title to the property without any abatement of the purchase price, in which event at the closing all of the insurance proceeds shall be assigned by Seller to purchaser and any moneys theretofore received by Seller in connection with such fire or other casualty shall be paid over to purchaser, less any amounts expended or committed by Seller for any repair or restoration or for securing the property, or (b) cancel this Agreement, in which event the deposit shall be returned to purchaser, and thereupon neither party shall have any further liability or obligation to the other with respect to the sale transaction contemplated hereby except as otherwise provided herein. Purchaser shall notify Seller of its election within five (5) days after receipt of Seller's notice and, if necessary, the closing shall automatically be extended to give the purchaser the full benefit of said five (5) day period. If purchaser fails to notify Seller of its election within said (5) day period, purchaser shall be deemed to have elected option (a).

      **12.**    **SELLER'S REMEDY**.

      12.01  <u>Seller's Liquidated Damages</u>.  If this sale of the Property is not consummated because of Purchaser's default hereunder, Seller shall be entitled, as its sole and exclusive remedy to retain the Deposit.

      Seller and Purchaser agree that the Deposit shall be retained by Seller as full liquidated damages, and not as a penalty, Purchaser and Seller hereby (i) acknowledge that Seller will suffer damages in the event of Purchaser's default; (ii) acknowledge the difficulty of accurately estimating Seller's actual damages in the event of a default by Purchaser, (iii) recognize that it is impossible more precisely to estimate the damages to be suffered by Seller upon a default by Purchaser, and (iv) agree that the Deposit constitutes a good faith and reasonable estimate of the potential damages arising from a default by Purchaser.

      12.02  <u>Waiver of Other Rights</u>. Seller hereby waives any and all other remedies available at law or in equity. SELLER HEREBY WAIVES ANY RIGHT TO, AND HEREBY COVENANTS THAT IT WILL NOT, SUE PURCHASER OR ANY OF ITS OFFICERS, DIRECTORS, EMPLOYEES, ATTORNEYS, OR AGENTS FOR DAMAGES, SPECIFIC PERFORMANCE OR ANY OTHER RELIEF. *Oct, 14, 14*

      **13.**    **INTENTIONALLY OMITTED.**

14.   **NOTICES**.   Wherever any notice or other communication is required or permitted hereunder, such notice or other communication shall be in writing and shall be delivered by hand, by a nationally-recognized overnight express delivery service, by U. S. Registered or certified mail, return receipt requested, postage prepaid, or by electronic transfer with prompt telephone confirmation to the addresses set out below or at such other addresses as are specified by written notice delivered in accordance herewith (any notice or other communication delivered as required in this Section 14 being referred to throughout this Agreement as a "notice"):

| | |
|---|---|
| To Purchaser: | Shang Hei, LLC<br>Attention: Victor Kwok<br>10001 Carrington Lane, Alpharetta, GA 30022<br>Cell: 404.403.6060<br>xin9228@yahoo.com |
| With Copies To: | John M. McGovern<br>McGovern Law Firm<br>7000 Miller Court East<br>Norcross, GA 30071<br>404.920.8510 (Office)<br>404.920.8512 (Fax)<br>jmcgovern@mcgovernfirm.com |
| To Seller: | Phillips Investments, LLC<br>P.O. Box 80129<br>Atlanta, Georgia 30366<br>Attn:  Ly Phillips |
| With Copies To: | Burroughs Keene Paulk & Von Schuch, LLC<br>Attn:  Kirk W. Keene<br>2900 Paces Ferry Road<br>Suite C-2000<br>Atlanta, Georgia 30339<br>Telephone:  (770) 432-2100<br>Fax:  (770) 432-9561<br>Email:  keene@bkpvlaw.com |
| To Escrow Agent: | Scroggins & Williamson, P.C.<br>Attention: J. Robert Williamson and Ashley Reynolds Ray<br>1500 Candler Building<br>127 Peachtree Street, N.E.<br>Atlanta, GA 30303<br>404.893.3880 (Office)<br>404.893.3886 (Fax)<br>rwilliamson@swlawfirm.com, aray@swlawfirm.com |

10/14/14

Any Notice delivered as hereinabove provided shall be deemed effectively given (a) on the date of delivery, if delivered by hand; (b) on the date received, if sent by overnight express delivery or if sent by U.S. mail; or (c) on the date of transmission, if sent by electronic transfer device with a follow-up by regular mail. Such Notices shall be deemed received (a) on the date of delivery, if delivered by hand or overnight express delivery service; (b) on the date indicated on the return receipt if mailed; or (c) on the date of transmission, if sent by electronic transfer device. If any party refuses delivery of any Notice, then such Notice shall be deemed delivered on the first date such delivery is refused or could otherwise have been completed.

15.    **INSPECTION AND INDEMNITY**. Purchaser shall have thirty (30) days after the date of this Agreement (the "Inspection Period"), to examine each and every condition of the property deemed relevant to Purchaser. Purchaser may terminate this Agreement in accordance with the provisions of this Section if Purchaser is not satisfied with the property for any reason whatsoever. If this Agreement is terminated in such manner, the Deposit shall be returned to Purchaser, whereupon neither party hereto shall have any further rights or obligations hereunder except those which survive the termination hereof. If Purchaser does not give any such notice on or prior to the expiration of the Inspection Period, Purchaser shall be deemed to have waived any rights to terminate this Agreement set forth in this Section 15, and thereafter the Deposit shall be non-refundable to Purchaser except as otherwise provided for herein.

16.    **PURCHASER'S ACCESS**. Purchaser shall have the right, after giving Seller reasonable prior notice, to enter the property at its own cost and expense to inspect the property for its suitability to Purchaser's intended use and to perform a Phase I environmental inspection (but not a Phase II environmental inspection or related tests without Seller's consent in its sole discretion). Seller will permit representatives of Purchaser at Purchaser's sole cost and expense and without liability to Seller to enter upon the property for the purposes of conducting tests, and inspections, or examinations (other than environmental tests, exams, inspections or investigations other than a Phase I) that Purchaser desires in regard to engineering and planning for future development of the property, including (but not by way of limitation) such other tests, inspections, or examinations as Purchaser may request to determine subsurface or topographic conditions of the property. Seller shall have the right, but not the obligation, to accompany Purchaser and/or any representatives of Purchaser while performing any inspections and/or tests on the property. Purchaser agrees that it will not, while Purchaser and/or its agents are performing any tests and/or inspections upon the property, perform any such tests in a manner as to interfere in any way with Seller's or Seller's Tenant's business operations on the property. Purchaser shall hold Seller harmless for any damages resulting from the exercise by Purchaser or the representatives or Purchaser of its rights under this Section, and Purchaser shall restore the property to the approximate condition existing immediately prior to any work performed by Purchaser or its agents.

17.    **NO ORAL MODIFICATION - ENTIRE AGREEMENT**. This agreement constitutes the entire agreement between the parties. There are no other agreements, oral or written. No prior discussions shall have any legal effect unless specifically included in this Agreement. Neither party is relying on any representation, warranty, promise, agreement or condition that is not contained in this Agreement. This agreement cannot be changed or modified other than by a written agreement executed by the parties hereto. OCT, 14, 14

13

18. **SUCCESSORS BOUND**. The provisions of this Agreement shall extend to, bind and inure to the benefit of the parties hereto and their respective personal representatives, heirs, successors and assigns.

19. **ASSIGNMENT**. At any time prior to Closing, Purchaser may assign its interests in this Agreement to an affiliate or affiliate of one or more of the owners of Purchaser upon written notice to Seller. However, Purchaser shall remain liable notwithstanding such assignment.

20. **GOVERNING LAW, CONSTRUCTION**. This agreement shall be governed by and construed in accordance with the laws of the State of Georgia. This agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted. All terms and words used in this Agreement, regardless of the number or gender in which they are used, shall be deemed to include any other number and any other gender as the context may require.

21. **COUNTERPARTS**. This agreement and any amendments thereto may be executed and delivered by facsimile or e-mail of PDF format documents, and in more than one (1) counterpart, each of which shall be deemed an original.

22. **EXHIBITS**. All exhibits attached hereto are incorporated into this Agreement by this reference.

> Exhibit A - Survey Map
> Exhibit B - Deed Restrictions
> Exhibit C- Existing Exceptions
> Exhibit D-Special Stipulations

23. **TIME OF THE ESSENCE**. TIME IS OF THE ESSENCE IN THIS AGREEMENT.

24. **TIME PERIODS**. If any time period under this Agreement ends on a Saturday, Sunday or legal holiday, such time period shall automatically be extended to the next business day that is not a Saturday, Sunday or legal holiday.

25. **DATE OF THIS AGREEMENT**. The effective date of this Agreement (the "date of this Agreement") shall be the date on which the last party to sign it, signs the agreement.

26. **NO RECORDING**. This agreement shall not be recorded without Seller's prior written consent. If this Agreement is recorded without such prior written consent, such recording shall constitute a default by Purchaser and this Agreement shall, at the option of Seller, become ipso facto null and void, and all payments made hereunder shall be forfeited and become the property of Seller as liquidated damages.

27. **1031 EXCHANGE**. Purchaser and Seller hereby acknowledge that Purchaser and/or Seller (the "Exchange Party") may desire to effectuate a tax-deferred exchange (also known as a "1031" exchange (the "Exchange")) in connection with the purchase and/or sale of all or a portion of the Property. Each party (the "Cooperating Party") hereby agrees to cooperate,

*Oct, 14, 14*

14

with the Exchange Party in connection with the Exchange contemplated by the Exchange Party, provided that:

27.01  All documents executed in connection with the Exchange (the "Exchange Documents") shall recognize that Cooperating Party is acting solely as an accommodating party to such Exchange, shall have no liability with respect thereto, and is making no representation or warranty that the transactions qualify as a tax-free exchange under Section 1031 of the Internal Revenue Code or any applicable state or local laws and shall have no liability whatsoever if any such transactions fail to so qualify.  All Exchange Documents executed by Cooperating Party in connection with the Exchange shall be in form and substance reasonably acceptable to Cooperating Party.

27.02  Such Exchange shall not result in Cooperating Party incurring any additional costs or liabilities (and Exchange Party shall pay all additional costs and expenses to the extent that such are incurred, including, without limitation, any additional costs or expenses incurred by Cooperating Party as a result of its participation in the Exchange).  Exchange Party shall indemnify, defend and hold Cooperating Party harmless from and against all claims, demands, liability, losses, damages, costs and expenses (including reasonable attorneys' and expenses at the trial and appellate levels and accountants' fees) suffered or incurred by Cooperating Party in connection with the Exchange.

27.03  In no event shall Cooperating Party be obligated to acquire any property or otherwise be obligated to take title, or appear in the records of title, to any property in connection with the Exchange.

27.04  In no event shall Exchange Party's consummation of such Exchange constitute a condition precedent to Exchange Party's obligations under this Agreement.  Exchange Party's failure or inability to consummate such Exchange shall be deemed to excuse or release Exchange Party from its obligations under this Agreement.

27.05  Purchaser and Seller further agree that, in connection with the foregoing, and subject in all respects to the foregoing provisions, Cooperating Party shall consent to Exchange Party assigning all or a portion of its rights under this Agreement to an exchange intermediary solely for the purpose of consummating such Exchange.  In no event shall any such assignment release Exchange Party of its obligations under this Agreement or any document executed pursuant to the terms hereof, including, without limitation, its indemnity obligations hereunder, or affect in any manner any of Exchange Party's representations, warranties or covenants set forth in this Agreement.

28.  **SEVERABILITY**.  This agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations, and is intended, and shall for all purposes be deemed to be, a single, integrated document setting forth all of the agreements and understandings of the parties hereto, and superseding all prior negotiations, understandings and agreements of such parties.  If any term or provision of this Agreement or the application thereof to any person or circumstance shall for any reason and to any extent be held to be invalid or unenforceable, then such term or provision shall be ignored,

Oct, 14, 14

and to the maximum extent possible, this Agreement shall continue in full force and effect, but without giving effect to such term or provision.

29.    **INTENTIONALLY OMITTED**

30.    **INTERRELATION**.  This agreement is in all respects intended by each party hereto to be deemed and construed to have been jointly prepared by the parties.  The parties hereby expressly agree that any uncertainty or ambiguity existing herein shall not be interpreted against either of them as a result of the actual identity of the draftsman.

31.    **DOLLARS**.  All reference herein to "dollar" or "$" shall mean U.S. Dollars.

32.    **SPECIAL STIPULATIONS**.  The special stipulations to this Agreement are attached hereto as Exhibit D.  In the event of a conflict between this Agreement and Exhibit D, Exhibit D shall prevail.

33.    **CUMULATIVE RIGHTS**.  All rights, powers, and privileges conferred by the agreement upon the parties shall be cumulative with, but not restricted to, those given by law.

34.    **WAIVER, ETC**.  No delay or failure by any party hereto in exercising any of its rights, remedies, powers or privileges under this Agreement or at law or in equity and no custom, practice or course of dealing between or among any of such parties or any other person shall be deemed a waiver by such party of any such rights, remedies, powers or privileges, even is such delay or failure is continuous or repeated.  No single or partial exercise of any right, remedy, power or privilege shall preclude any other or further exercise of any other right, remedy, power or privilege by such party, including, without limitation, the right of such party subsequently to demand exact compliance with the terms of this Agreement.

35.    **SUCCESSORS**.  This agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, personal and legal representatives, successors and assigns.

36.    **AMENDMENT**.  Any amendment to this Agreement shall be binding upon Purchaser and Seller as soon as a written amendment has been executed by both. Only written amendments to this Agreement shall be effective.  For purposes of this Section the sending of a fax constitutes a "writing" executed by the party sending the fax.

37.    **NO SURVIVAL**.  Unless specifically set forth herein to the contrary, all terms and conditions hereof shall merge into the warranties in the deed granted to Purchaser at closing, and shall not survive closing.    *OQ, 14, 14*

38.    **INTENTIONALLY DELETED.**

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement under seal on the date indicated below the signature of each party.

**SELLER:**

PHILLIPS INVESTMENTS, LLC, a Georgia limited liability company

By: _L. Phillps (manager)_

    Name:

    Title:

Date: _Oct, 14 2014_

**PURCHASER:**

Shang Hei, LLC, a Georgia limited liability company

By: _____

    Name:

    Title:

Date: _10\3\14_

EIN#

17



EXHIBIT A

Oct, 14, 14

EXHIBIT "B"

DEED RESTRICTIONS

No portion of the Property shall be used for any of the following purposes:  a flea market or a
business selling so-called "second hand" goods (the term "second hand" shall mean stores which
sell goods primarily as a service to the public rather than to a retail customer for a profit); a junk
yard or salvage yard; an animal fat rendering plant; a rubbish or trash transfer station; a land fill;
a cemetery; a mortuary; a morgue; any establishment engaged in the business of selling,
exhibiting or delivering nudity or pornographic or obscene materials; an adult entertainment
facility; a so-called "head shop"; an off-track betting parlor; a junk yard; a recycling facility (of
any kind) or stockyard; a motor vehicle or boat dealership, repair shop (including lubrication and
/or service center) that stores vehicles outdoors overnight, body and fender shop, or motor
vehicle or boat storage facility; a mini-storage or self-storage facility; a laundromat or dry-
cleaning facility (but this shall not be deemed to prohibit nominal supportive facilities for on-site
service oriented to pickup and delivery by the ultimate consumer); a billiard or pool hall; a
massage parlor; a game parlor; a place of instruction or any other operation catering primarily to
students or trainees and not to customers (but shall specifically not prohibit a school which is
incidental to a primary retail purpose); a church; a nursing home; a day care center (exclusive of
such a day care center in any multifamily facility that solely serves the residents of such facility);
an electronics equipment wholesaler or retailer [provided that the foregoing shall not prohibit the
sale of electronics equipment by a department store, whose primary business is not the sale at
retail or wholesale of electronics equipment, in the lesser of (i) five percent (5%) in the aggregate
of such department store's leaseable floor area, or (ii) 2,000 square feet in the aggregate of such
department store's leaseable floor area]; or any use that would prohibit Gwinnett Prado, L.P. or
any of its partners or affiliates, or any of their respective affiliates, successors or assigns, from
obtaining a liquor license for any parcel it owns adjacent to and in the general vicinity of the
Property.

No oil development operation, oil refining, quarrying or mining operations of any kind shall be
permitted upon or in any portion of the Property, nor shall oil wells, tanks tunnels, or mineral
excavation or shafts, be permitted upon the surface of any portion of the Property, or within five
hundred (500) feet below the surface of any of the Property.  No derrick or other structure
designed for use in boring for water, oil, natural gas or other minerals shall be erected,
maintained or permitted on any portion of the Property.

The foregoing restrictions shall automatically expire on the twentieth (20th) anniversary of the
date of the Limited Warranty Deed from Gwinnett Prado, L.P. into Global Station, LLC dated
April 27, 2006 recorded in Deed Book 46436, Page 509, Gwinnett County ,Georgia records, the
same being April 27, 2026.                            Oct, 14, 14

18

## EXHIBIT "C"

### EXISTING EXCEPTIONS

All general and special taxes and assessments for the year 2013 and subsequent years, liens not yet due and payable and any additional taxes, interest and/or penalties which may be assessed for prior tax years by virtue of adjustment, re-appraisal, re-assessment, appeal or other amendment to the tax records of the city or county in which the subject property is located.

Easements, and easements only, found within Warranty Deed from Partridge Greene, Inc., to Gwinnett Plantation, Ltd. dated January 7, 1985, filed for record January 11, 1996, recorded in Deed Book 2954, Page 389, Gwinnett County, Georgia Records, as modified by Modification to Restrictive Covenants dated December 2, 1994, recorded in Deed Book 10896, Page 174, aforesaid Records.

Easements in favor of Georgia Power Company as follow:
(a)      from Mrs. May Hammock dated September 26, 1940, recorded in Deed Book 67, Page 593, aforesaid Records.
(b)      from Mrs. Bertha B. Taylor dated September 17, 1945, recorded in Deed Book 77, page 144, aforesaid Records.
(c)      from Mrs. Bertha B. Taylor dated April 28, 1953, recorded in Deed Book 111, Page 329, aforesaid Records.

Agreement for Sewer Service between Southern Region Industrial Realty, Inc., and Gwinnett County, dated June 5, 1974, recorded in Deed Book 830, Page 203, aforesaid Records.

Easement Agreement between Partridge Greene, Inc. and Gwinnett Station, Ltd., dated September 21, 1983, recorded in Deed Book 2647, Page 87, aforesaid Records.

Slope and Drainage Easement Agreement between Partridge Greene, Inc. and Gwinnett Station, Ltd., dated November 29, 1983, recorded in Deed Book 2681, Page 626, aforesaid Records.

Easement Agreement between Partridge Greene, Inc. and American Tectonics of Georgia dated October 30, 1984, recorded in Deed Book 2907, Page 460, aforesaid Records; and as amended by First Amendment to Easement Agreement dated March 26, 1985, recorded in Deed Book 3006, Page 139, aforesaid Records.

Right of Way Easement from Partridge Greene, Inc. to Gwinnett Plantation, Ltd., dated January 7, 1985, recorded in Deed Book 2954, Page 387, aforesaid Records.

Easement from Partridge Greene, Inc. to Gwinnett County dated March 2, 1988, recorded in Deed Book 4789, Page 125, aforesaid Records; as corrected by instrument recorded in Deed Book 5670, Page 161, aforesaid Records.                                          Oct, 14/14

Right of Way Easement from Partridge Greene, Inc. to Jackson Electric Membership Corporation dated March _____, 1988, recorded in Deed Book 4841, Page 39, aforesaid Records.

Declaration of Surface and Storm Water Drainage Easements between Partridge Greene, Inc. and Capcount America, Inc. dated March 31,1988, recorded in Deed Book 4854, Page 110, aforesaid Records, as amended by Drainage Easement from Gwinnett Prado, L.P. to Capital & Countries U.S.A., Inc. dated July 31, 1995, recorded in Deed Book 11687, Page 211, aforesaid Records.

Declaration of Surface and Storm Water Drainage Easements between Partridge Greene, Inc. and Lechmere, Inc. dated May 11, 1988, recorded in Deed Book 4898, Page 38, aforesaid Records.

Easement from Lechmere, Inc. to Gwinnett County dated September 10, 1985, recorded in Deed Book 3190, Page 45, aforesaid Records.

Easements, and easements only, contained within that Warranty Deed from Partridge Greene, Inc. to Lechmere dated May 30, 1985, recorded in Deed Book 3073, Page 488, aforesaid Records. NOTE: These restrictions affect a small portion of the subject property that was reconveyed to Partridge Greene, Inc. by Special Warranty Deed from Lechmere, Inc. dated May 11,1988 recorded in Deed Book 4898, Page 49, aforesaid Records.

Easements, and Easements only, contained in Warranty Deed from Partridge Greene, Inc. to Capcount America, Inc. dated March 1, 1984, recorded in Deed Book 2735, Page 43, aforesaid Records; as corrected by Corrective Warranty Deed recorded in Deed Book 2927, Page 292, aforesaid Records. NOTE: These restrictions affect a small portion of subject property that was reconveyed to Partridge Greene, Inc. by General Warranty Deed from Capcounty America, Inc. dated March 31, 1988, recorded in Deed Book 4854, Page 92, aforesaid Records.

Access Easement from Gwinnett Prado, L.P. to Capital & Countries U.S.A., Inc. dated July 31, 1995, recorded in Deed Book 11687, Page 220, aforesaid Records.

Access and Drainage Easement from Gwinnett Prado, L. P. to Quiktrip Corporation dated April 5, 1991, recorded in Deed Book 6482, Page 155, aforesaid Records.

Easement from Partridge Greene, Inc. to CF-H Gwinnett Associates dated March 31, 1982, recorded in Deed Book 2357, page 251, aforesaid Records, as corrected and restated by instrument recorded in Deed Book 2478, page 422, aforesaid Records; as amended by instrument recorded in Deed Book 2485, Page 332, aforesaid Records; as modified by Scriveners Affidavit recorded in Deed Book 2903, Page 613, aforesaid Records.

Sewer Easement from Partridge Greene, Inc. to Gwinnett County dated May 3, 1982, recorded in Deed Book 2383, Page 157, aforesaid Records.

Access Easement from Galen Kilburn, Jr. to Partridge Greene, Inc. dated September 27, 1982, recorded in Deed Book 2456, Page 146, aforesaid Records, as modified by instrument recorded in Deed Book 2647, page 92, aforesaid Records.

*Oct, 14, 14*

20

Utility Easement from Galen Kilburn, Jr. to Gwinnett County, Georgia dated September 27, 1982, recorded in Deed Book 2456, Page 152, aforesaid Records.

Easements, and easements only reserved by Partridge Greene, Inc. in Warranty Deed dated June 4, 1982, recorded in Deed Book 2405, Page 17, aforesaid Records, as amended by instrument recorded in Deed Book 2461, Page 114, aforesaid Records, as amended by instrument recorded in Deed Book 4801, Page 50, aforesaid Records.

Easements, and easements only contained within Reciprocal Easement Agreement between Partridge Greene, Inc. and Lechmere, Inc. dated May 30, 1985, filed for record September 6, 1985, recorded in Deed Book 3139, Page 208, aforesaid Records.

Easements, and easements only, contained within that Declaration of Easement and Restrictions by Gwinnett Station, Ltd. dated May 26, 1983, recorded in Deed Book 2563, Page 173, aforesaid Records, as amended by instrument recorded in Deed Book 2743, Page 360, aforesaid Records, as amended by instrument recorded in Deed Book 2802, Page 254, aforesaid Records, as amended by instrument recorded in Deed Book 2840, Page 7, aforesaid Records.

All matters as shown on Plat Book 51, Page 268, aforesaid Records.

All matters as shown on that certain survey for Phillips Investments, LLC and Stewart Title Guaranty Company, prepared by Development Consultants Group, by Donald G. Holland (Georgia Registered Land Surveyor No. 2637) dated April 24, 2006, as last revised July 16, 2007.

Right of Way Deed from Gwinnett Prado, L.P. to Gwinnett County dated January 31, 2005, filed for record April 24, 2006, recorded in Deed Book 46414, Page 647, Gwinnett County, Georgia Records.

Permanent Construction Easement from Gwinnett Prado, L.P. to Gwinnett County dated January 31, 2006, filed for record April 24, 2006, recorded in Deed Book 46414, Page 652, aforesaid Records.

Right of Way Deed from Gwinnett Prado, L.P. to Gwinnett County dated January 31, 2006, filed for record April 24, 2006, recorded in Deed Book 46414, Page 662, aforesaid Records.

Reservation and Declaration of Cross Easements between Gwinnett Prado, LP, and Mark R. Hudgens dated April 27, 2006, filed for record April 28, 2006, recorded in Deed Book 46436, Page 475, aforesaid Records.

Rights of tenants under unrecorded leases or occupancy agreements.

Deed Restrictions as provided in Exhibit "B" to that certain re-recorded Limited Warranty Deed from Gwinnett Prado, L.P. to Global Station, LLC originally dated April 27, 2006, recorded in ~

*Oct, 14, 14*

21

Deed Book 46436, Page 509, re-recorded July 20, 2007 in Deed Book 48102, Page 688, in the official records of Gwinnett County, Georgia.

Restrictions contained within that Limited Warranty Deed from Global Station, LLC to Phillips Investments, LLC dated July 19, 2007, filed for record July 20, 2007, recorded in Deed Book 48102, Page 697, Gwinnett County, Georgia Records.     *Oct, 14, 14*

## EXHIBIT "D"

## SPECIAL STIPULATIONS

Seller will provide Purchaser with copies of the following within five (5) days of the date of this Agreement.

A.    Rent Roll for most recent month which includes the names of the Tenants and the minimum rent charged.

B.    Copies of all Leases.

Both parties agree to cooperate with each other as is reasonable necessary to carry out 1031 tax exchange.

If Purchaser does not close on the Property, all documentation provided by Seller to Purchaser will be returned immediately and all documentation provided will be kept confidential from third parties.

This Agreement is subject and conditioned upon approval of the court in Bankruptcy Case In Re: Phillips Investments, LLC, Case No. 14-61444, Chapter 11, in the U.S. Bankruptcy Court for the Northern District of Georgia, Atlanta Division ("Bankruptcy Case"). In addition, the sale is conditioned upon the bankruptcy court's entry of a final, non-appealable order that the property is free and clear of all liens, claims, and encumbrances, pursuant to 11 U.S.C. 363(f), and that the lease assignments are allowed pursuant to 11 U.S.C. 365. Also, the sale is conditioned upon the bankruptcy court's finding that the sale is in good faith pursuant to 11 U.S.C. 363(m).

If the Purchaser does not terminate this Agreement within the Inspection Period or breach this Agreement and  approval of this Agreement (or a subsequent purchase agreement between Purchaser and Seller) is not obtained in the Bankruptcy Case  within sixty (60) days after the Inspection Period ends, then 1) Seller or Seller's managing member shall pay Purchaser up to Fifteen Thousand Dollars ($15,000) to reimburse the Purchaser for costs incurred during the Inspection Period and 2) the Seller's bankruptcy counsel shall return the Deposit to Purchaser and thereafter neither party shall have any further rights or obligations hereunder except those which survive the termination hereof.                                    Oct, 14, 14

**EXHIBIT "B"**

### GWINNETT STATION LEASES
### 2180 Pleasant Hill Road
### Duluth, Georgia 30096

| TENANT | SUITE # |
|---|---|
| Progressive Peach, Inc<br>d/b/a CD Warehouse | B14/15 |
| Taste of Pho Vietnamese Kitchen, Inc<br>d/b/a Taste of Pho Restaurant | B1 |
| Tuan Van Tran<br>d/b/a TK Travel | A5 |
| Jie Fu Sun<br>d/b/a AT Hair Studio | A12-13 |
| Sweet Hut Pleasant Hill, Inc<br>d/b/a Sweet Hut Bakery | A14-18 |
| The Coffee by Hand, LLC | A1 |
| Bai W Li<br>d/b/a Master Hot Pot | A3 |
| Hang Yang<br>d/b/a Snowflake | A8/9 |

**EXHIBIT "C"**

## GWINNETT PRADO LEASES
### 2300 Pleasant Hill Road
### Duluth, Georgia 30096

| TENANT | SUITE # |
|---|---|
| CNJ World, LLC, Byung T. Son, Mi Ra Jeong and Jong Lae Jeong d/b/a Shogun Japanese Restaurant | B3 |
| Office Max North America, Inc d/b/a Office Max | B4/5 |
| Great Wall Supermarket of GA, Inc d/b/a GW Supermarket | B6 |
| Tech Comm, Inc d/b/a TMobile | B8 |
| Pig Brothers, LLC and Hyok Yi | B3 |

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a true and correct copy of the within and foregoing **Debtor's Motion (A) for Authority to Sell Certain Real Property and Related Assets of the Debtor Free and Clear of Liens, Claims, and Encumbrances, (B) to Approve the Assumption and Assignment of Certain Leases in Connection Therewith, and (C) Certain Related Relief** by depositing same in the United States Mail in an envelope with adequate postage affixed thereto to assure delivery addressed to the following persons:

Vivieon E. Kelley
Office of the United States Trustee
362 Richard Russell Federal Building
75 Spring Street, SW
Atlanta, Georgia 30303

James H. Rollins
Holland & Knight LLP
One Atlantic Center, Suite 2000
1201 West Peachtree Street
Atlanta, Georgia 30309-3400

John M. McGovern
McGovern Law Firm
7000 Miller Court East
Norcross, Georgia 30071

This 24th day of October, 2014.

SCROGGINS & WILLIAMSON, P.C.

1500 Candler Building
127 Peachtree Street, NE
Atlanta, GA 30303
T: (404) 893-3880
F: (404) 893-3886
E: rwilliamson@swlawfirm.com
   hkepner@swlawfirm.com

/s/ J. Hayden Kepner, Jr.
J. ROBERT WILLIAMSON
Georgia Bar No. 765214
J. HAYDEN KEPNER, JR.
Georgia Bar No. 416616

*Counsel for the Debtor*